```
            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE

WILLIAM FRANCIS, JR.,                  :
                                       :
          Plaintiff,                   :
                                       :
     v.                                :
                                       :
WARDEN THOMAS CARROLL,                 : Civil Action No. 07-015-JJF
CORRECTIONAL MEDICAL SERVICES,         :
STAN TAYLOR and JOYCE TALLEY,          :
                                       :
          Defendants.                  :
                                       :
```

William Francis, Jr., <u>pro</u> <u>se</u>.

Eileen M. Ford, Esquire and Megan Trocki Mantzavinos, Esquire of
MARKS, O'NEILL, O'BRIEN & COURTNEY, P.C., Wilmington, Delaware.

Attorneys for Defendant Correctional Medical Services, Inc.

**MEMORANDUM OPINION**

September 22, 2009
Wilmington, Delaware

Joseph J. Farnan Jr.
Farnan, District Judge.

Pending before the court is Defendant Correctional Medical

Services, Inc.'s ("CMS") Motion For Summary Judgment (D.I. 75) on

Plaintiff's claim under 42 U.S.C. § 1983 for improper medical

care in violation of the Eighth Amendment and Plaintiff's claim

for violation of his substantive due process and equal protection

rights under the Fourteenth Amendment. For the reasons

discussed, the Motion will be granted.

## I. BACKGROUND

The following facts are taken from the Complaint and other

documents and exhibits submitted by the parties. Plaintiff,

William Francis, Jr. ("Plaintiff"), was diagnosed with

periodontal disease in 1997. (D.I. 77, Ex. A at 101.) He was an

inmate at the Delaware Correction Center ("DCC") from January 6,

2004 until May 14, 2008, when he was released from DCC. (D.I. 76

at 2; D.I. 77, Ex. A at 28, 102.) On July 1, 2005, CMS became

the medical provider for DCC.[1] (D.I. 76 at 1.) From July 2005

---

[1] Plaintiff testified in his deposition that he saw dental
staff at DCC for cleanings, a tooth extraction, and non-surgical
procedures to treat his periodontal disease many times prior to
July 1, 2005, when CMS took over as the contractual medical
provider at DCC. (D.I. 76, Ex. A at 103-16.) Plaintiff also
testified that he filed five grievances with DCC and/or First
Correctional Medical, CMS's predecessor, during that time,
requesting that he be allowed to use dental floss or dental
toothpicks. (Id. at 110-22.) Three grievances were denied as
nongrievable on the ground that dental floss was not permitted in
the prison for security reasons, one was resolved informally with
Plaintiff, and another was treated as an appeal and forwarded to
the Medical Grievance Committee. (Id.; Id., Exs. B-4-B-6, B-8-B-

1

until his release from DCC, Plaintiff had several appointments with CMS dental staff, and during those visits, he received dental and non-surgical periodontal care.[2]  (See D.I. 77, Ex. A at 122-24, 132-34, 137-40; id. Ex. B-2.)  Over the course of these visits, Plaintiff received cleanings, scalings, and other procedures, as well as advice on continuing dental and periodontal care available to Plaintiff at DCC.  (Id.)

During the same time period, Plaintiff continued to pursue a possible resolution of his complaints through the available medical grievance processes.  One of the four medical grievances Plaintiff filed in June 2005, Grievance #15037, continued through the grievance process after CMS became the medical provider at DCC, and was forwarded to the Medical Grievance Committee ("MGC") on August 4, 2005.  (Id., Ex. B-11.)  The grievance eventually was denied, and it was returned to Plaintiff on March 20, 2006. (Id.)  Plaintiff appealed, adding to his request for dental floss or toothpicks a claim that "[t]he [CMS] dental staff admitted that I need treatment from a periodontist, specifically: 1) Gingivectomy . . . ; 2) Curettage . . . ; and 3) Surgical

_____

11.)  Although not relevant to Plaintiff's claims against CMS, the Court mentions this prior history here for the sake of completeness.

    [2] Specifically, Plaintiff saw CMS dental staff on the following dates: 7/28/2005, 8/22/2005, 9/2/2005, 12/21/2006, 2/23/2007, 8/15/2007, and 8/21/2007.  (D.I. 77, Ex. A at 122-24, 132-34, 137-40; id., Ex. B-2.)

implants and/or partial dentures . . . ."  (Id.)  On September
25, 2006, the Bureau Grievance Officer upheld the denial of
Grievance #15037, with the comment "[d]ental f/u (periodontal
disease)."  (Id.)

On October 24, 2006, Plaintiff wrote a letter to John
Rundle, Health Services Administrator, requesting to be seen by
an outside periodontist to determine what surgical procedures he
might need to undergo for his continuing periodontal care.  (Id.,
Ex. B-14.)  On November 5, 2006, Plaintiff wrote to Deputy Warden
Pierce reiterating the same request.  (Id., Ex. B-15.)  Deputy
Warden Pierce replied on November 27, 2006, stating that he
received Plaintiff's November 5 letter and forwarded Plaintiff's
concerns to the Director of Nursing "for investigation and
action."  (Id.)  In late November or early December 2006,[3] the
Bureau of Prisons Chief wrote to Plaintiff to inform him that
"[w]e have reviewed your Grievance Case #15037 dated 6/16/2005.
Based upon the documentation presented for our review, we uphold
your appeal request."  (Id., Ex. B-12.)  Plaintiff testified in
his deposition that he understands this to be approval for him to
pursue his remedy in court.  (Id., Ex. A at 130.)  On December 7,
2006, Scott Altman, Quality Assurance Monitor for CMS, wrote

---

[3] The first line of the letter bears two different dates,
one printed on top of the other.  One appears to be November 23,
2006, and the other appears to be December 5, 2006.  (D.I. 77,
Ex. B-12.)

Plaintiff in response to Plaintiff's November 5 letter. Altman informed Plaintiff that "[t]he use of floss and picks in the institution is a security issue, and we cannot authorize devices for use that are prohibited by security." (Id., Ex. B-15.) Altman also noted that Plaintiff had not requested dental care in over one year at that time, and advised Plaintiff to submit a "sick call slip," a request to see medical staff, if he continued to have periodontal problems. (Id.) Plaintiff submitted a sick call slip on December 13, 2006, and was seen by the dental staff on December 21, 2006. (Id., Ex. B-13.) During this visit, he inquired again as to the status of his request to see an outside periodontist. The CMS dentist who saw Plaintiff on this visit explained that "the majority of inmates here have gum disease and we can't send everybody out to a specialist." (Id., Ex. B-2.) Plaintiff was also informed that he would be kept on the cleaning list continuously, so that he would not have to wait a year between cleanings, and he apparently was satisfied with this accommodation. (Id.)

Plaintiff filed the present action on January 9, 2007. (D.I. 2.) Meanwhile, he continued to receive dental care from CMS. On February 23, 2007, he was seen by CMS dental staff, and the notes from this visit indicate that Plaintiff received scaling and cavitron procedures to monitor and control his periodontal disease. (D.I. 77, Ex. B-2.) Plaintiff was seen

4

next on August 15, 2007, in response to a sick call slip he submitted, and he received a cavitron procedure and deep pocket cleaning. (Id.) He was also informed that he "would need surgery to clean [the periodontal pockets around some of his teeth], if [the teeth were in fact] savable." (Id.) Plaintiff stated that he would be released from DCC in about seven months and would see a periodontist as soon as possible thereafter. (Id.) The next day, Plaintiff submitted another sick call slip because his gums had been bleeding since the previous day's cleaning. (Id., Ex. B-16.) On August 21, 2006, Plaintiff was seen by dental staff in response to the August 16 sick call slip. By then, Plaintiff's bleeding had stopped, and he stated that he had no pain and no problem swallowing. (Id., Ex. B-2.) The attending dentists apparently suggested extraction of one of Plaintiff's teeth, but Plaintiff stated he did not wish to undergo extraction of a tooth and that he wanted to wait, if possible, to see a periodontist. He stated that if his tooth hurt he would put in a sick call for extraction. (Id.) This was apparently the last time Plaintiff saw any CMS dental staff at DCC before his release,[4] and his condition subsequently improved after DCC lifted the ban on dental floss and similar devices on September 10, 2007. (Id., Ex. A at 50, 58-59.)

_____

[4] Plaintiff's updated medical records, covering the period after August 2007, show the August 21, 2007 dental visit as his final one. (D.I. 72, Ex. 11.)

5

## II.  THE PARTIES' CONTENTIONS

CMS moves for summary judgment first on the ground that, in an action brought pursuant to 42 U.S.C. § 1983, it cannot be held liable for a violation of Plaintiff's constitutional rights under a respondeat superior theory, and that Plaintiff has failed to allege any CMS policy or custom that deprives him of a constitutional right.  (D.I. 76.)  Second, CMS contends that because Plaintiff does not have a fundamental right to see a periodontist, it did not violate Plaintiff's substantive due process rights under the Fourteenth Amendment by refusing to allow him to see such a specialist.  Third, CMS argues that Plaintiff has failed to show that his Fourteenth Amendment equal protection rights were violated.  Finally, CMS also contends that the dental care it provided to Plaintiff was reasonable, that Plaintiff has not shown that CMS was deliberately indifferent to his serious medical needs, and that courts should show some deference to the decisions of medical providers in making medical decisions, such as whether to classify periodontal disease as a chronic care disease.

Plaintiff responds that the question of whether CMS was deliberately indifferent to his periodontal disease is a fact-specific inquiry, and that given "the advanced stage of his disease," as well as other circumstances, CMS's level of care fell to the level of deliberate indifference.  (D.I. 91 at 2, 9.)

6

He contends that periodontal disease is a serious medical need, and that CMS was deliberately indifferent to this need and violated his Eighth Amendment rights by refusing to allow him to see a periodontist. (D.I. 10 at 3, 7.) He alleges that these actions violated his substantive due process and equal protection rights under the Fourteenth Amendment. (Id. at 3, 8.) Specifically, Plaintiff contends that he had a right under the due process clause and/or the equal protection clause of the Fourteenth Amendment to specialist care, especially in light of the fact that other inmates suffering from non-dental conditions were allegedly permitted to see outside specialists. (D.I. 91 at 3-7.)

## III. LEGAL STANDARD

The Court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986).

When determining whether a genuine issue of material fact exists, the Court must view the evidence in the light most

favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted).

If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co., 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

### A. Eighth Amendment Claim

The government has an "obligation to provide medical care for those whom it is punishing by incarceration." Estelle v. Gamble, 429 U.S. 97, 104 (1976). CMS concedes that it is acting under color of state law for the purposes of 42 U.S.C. § 1983, (D.I. 76 at 16), and that it therefore assumes the State's Eighth

Amendment obligations to prisoners. See West v. Atkins, 487 U.S. 42, 48 (1988). In an action under § 1983 for improper medical care in violation of the Eighth Amendment, the plaintiff must have a serious medical need and prison officials' acts or omissions must indicate deliberate indifference to that need. Id. Deliberate indifference consists of "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle, 429 U.S. at 104-05. Neither mere negligence nor medical malpractice constitutes deliberate indifference, and thus, neither violates the Eighth Amendment. Id. at 106; White v. Napoleon, 897 F.2d 103, 108-109 (3d Cir. 1990). "[C]ulpability under 'deliberate indifference' requires a subjective awareness of the risk of harm, in addition to a failure to take reasonable steps to avoid that harm." Maclary v. Carroll, Civ. No. 04-065-JJF, 2008 U.S. Dist. LEXIS 14703, at *6 (D. Del. Feb. 26, 2008) (citing Farmer v. Brennan, 511 U.S. 825, 837 (1994)). "[M]ere disagreement as to the proper medical treatment" is insufficient to establish an Eighth Amendment violation. Monmouth County Corr. Institutional Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987) (citations omitted).

In addition, although a private corporation offering medical services to inmates cannot be held liable for an alleged § 1983 violation under a theory of respondeat superior, it "can be held

liable for a policy or custom that demonstrates deliberate indifference." Miller v. Correctional Medical Systems, Inc., 802 F. Supp. 1126, 1132 (D. Del. 1992) (citing Monell v. Dep't of Social Servs. of N.Y., 436 U.S. 658 (1978)). Thus, in the present action, CMS would be liable to Plaintiff if Plaintiff can show that "there was a relevant [CMS] policy or custom, and that the policy caused the constitutional violation" he alleges. Natale v. Camden County Corr. Facility, 318 F.3d 575, 583-84 (3d Cir. 2003). "Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)), superseded in part by statute, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1072, § 102. A course of conduct not expressly authorized by law becomes a "custom" when the challenged "practices of state officials [are] so permanent and well settled" as to virtually constitute law. Monell, 436 U.S. at 690. In order to establish CMS's § 1983 liability under either a policy or a custom argument, "it is incumbent upon [Plaintiff] to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom." Andrews, 895 F.2d at 1480 (citing Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989)). The "policymaker" is the person who "has

final, unreviewable discretion to make a decision or take an action," and who is or is not a policymaker is determined by reference to state law. Andrews, 895 F.2d at 1481.

### 1. Deliberate Indifference

Based on the record before it, the Court concludes that no reasonable jury could conclude that CMS was deliberately indifferent to Plaintiff's serious medical needs when it refused to refer him to an outside periodontist. Deliberate indifference requires "conduct that includes recklessness or a conscious disregard of a serious risk." Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999). Deliberate indifference exists where a prison official or medical staff member: (1) knows of the prisoner's need for treatment but intentionally refuses to provide it; (2) delays necessary medical treatment for non-medical reasons; or (3) prevents a prisoner from receiving needed or recommended treatment. Id. (emphasis added). Plaintiff has not shown that CMS employees were reckless or consciously disregarded a serious risk to his health. First, the record does not demonstrate that there was a serious risk of harm to Plaintiff as a result of his not being able to see an outside periodontist. The relevant time frame here is the thirty-five months between the time CMS became the DCC medical provider (July 1, 2005) and the time Plaintiff was released from DCC (mid-May 2008). The Court notes that there were two periods during the

11

relevant time frame where Plaintiff went without requesting dental care - not even a cleaning - from CMS staff for eight months or more.[5] One of these periods was over a year. The existence of such lengthy periods during which Plaintiff sought no dental care at all from CMS - comprising nearly twenty-two of the approximately thirty-five months Plaintiff spent under CMS's care at DCC - suggests that Plaintiff was not at serious risk of harm as a result of his condition for the relevant time frame.

Second, even if Plaintiff was at serious risk of harm, CMS staff did not exhibit recklessness or conscious disregard of Plaintiff's condition. In spite of the two lengthy periods during which Plaintiff sought no dental care, CMS staff still saw Plaintiff regarding his periodontal disease no fewer than seven times over the relevant thirty-five month time period. See supra, n.2. During those seven visits, Plaintiff received cleanings, scrapings, and cavitron treatments for his periodontal disease. Plaintiff's overall health, including his periodontal condition, actually appears to have improved during his time under CMS care in DCC, perhaps owing in part to a change in DCC security policy in the fall of 2007 that eliminated a ban on dental floss. (D.I. 77, Ex. A at 50-51, 58-60 (Plaintiff

---

[5] The first such period ran from September 2, 2005 until December 21, 2006, and the second period ran from August 21, 2007 until Plaintiff's release from DCC in mid-May 2008. (D.I. 77, Ex. B-2.)

discusses the abatement not only of his periodontal disease but also of his allegedly related heart palpitations and other conditions).) CMS points out that "Plaintiff testified that other than the extraction of tooth #17 in March 2004" - well prior to CMS's assumption of duties as DCC medical provider - "he has not lost any additional teeth." (D.I. 76 at 17.) Additionally, the record shows that CMS dental staff responded in a timely fashion to the two sick call slips Plaintiff submitted during the relevant time frame.[6] The record also shows that CMS staff went against CMS policy, to Plaintiff's benefit, on at least one occasion by allowing him to be placed immediately back on the waiting list for cleanings after receiving a cleaning, even though all other inmates were only allowed one cleaning per year. In these circumstances, no reasonable jury could conclude that CMS or its employees acted with recklessness or conscious disregard of Plaintiff's condition.

Third, Plaintiff has failed to demonstrate that he was denied necessary or recommended care as recognized under the three types of scenarios in which the Third Circuit has found deliberate indifference, as explained in Rouse. On the one hand, Plaintiff alleges that some time prior to March 20, 2006, "the [CMS] dental staff admitted that I need treatment from a

---

[6] Plaintiff was seen on December 21, 2006, in response to a sick call slip dated December 13, 2006. He was seen on August 21, 2007, in response to an August 16, 2007, sick call slip.

13

periodontist." (D.I. 77, Ex. B-11.) His medical records also show that on his August 15, 2007 visit, Plaintiff was informed that he "would need surgery to clean [the periodontal pockets around some of his teeth], if [the teeth were in fact] savable." (Id., Ex. B-2.) However, viewing all of the facts together in the light most favorable to Plaintiff, the Court concludes that Plaintiff was not denied needed or recommended care, and that accordingly, CMS's conduct did not rise to the level of deliberate indifference to Plaintiff's medical needs. Again, CMS staff saw Plaintiff seven times during the relevant period and administered various types of non-surgical care, and Plaintiff's overall condition appears to have improved during that time. In these circumstances, two alleged instances where CMS dental staff told Plaintiff he "needed" surgery, even if taken as true, are not enough to demonstrate deliberate indifference. At most, it appears that CMS staff may have disagreed about the proper way to treat Plaintiff's periodontal disease. However, this is not conduct rising to the level of an Eighth Amendment violation. Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004); see also Diaz v. Carroll, No. 08-3665, 2009 U.S. App. LEXIS 8601, at *9-*10 (3d Cir. Apr. 22, 2009) (not precedential) (affirming district court's finding that CMS was not deliberately indifferent to inmate's medical needs even though one doctor stated that inmate "need[ed] surgery"). Accordingly, the Court

14

concludes that no reasonable jury could find that CMS was
deliberately indifferent to Plaintiff's serious medical needs,
and summary judgment on this ground is appropriate.

### 2. Policy Or Custom

CMS may not be held liable for the harm Plaintiff alleges
under a respondeat superior theory; however, it can be held
liable if Plaintiff shows that CMS had a "relevant policy or
custom [that] caused the constitutional violation" Plaintiff
alleges. Natale, 318 F.3d at 583-84. In order to show the
existence of a policy or custom, "it is incumbent upon
[Plaintiff] to show that a policymaker is responsible either for
the policy or, through acquiescence, for the custom." Andrews,
895 F.2d at 1480. Even if CMS employees had been deliberately
indifferent to Plaintiff's serious medical needs, Plaintiff has
not shown "any evidence of a conscious decision or deliberate
indifference of any high-level official alleged to have the
appropriate policy-making authority," and therefore, Plaintiff
has not demonstrated that there existed a CMS policy or custom of
denying needed dental care. Muir v. Wilson, No. 02-2779, 2003
U.S. Dist. LEXIS 3035, at *6 (E.D. Pa. Feb. 7, 2003); Andrews,
895 F.2d at 1480. While Plaintiff has named three natural person
Defendants who might conceivably be "policymakers" capable of
creating policy or acquiescing to a custom, the record does not
contain information or allegations concerning who had final

15

decision-making authority with respect to the alleged policy or custom. The three natural person Defendants that Plaintiff has named in the present action are employees of the Department of Correction, not CMS, and Plaintiff does not allege that those Department of Correction Defendants were responsible for creating CMS policies or customs. The only other evidence in the record even hinting at who might have created CMS policy or acquiesced in CMS custom is in the affidavit of Dr. Cathy Kionke. (D.I. 77, Ex. D.) She states, "[f]rom July 1, 2005 to December 1, 2006, I served as the Dental Director for CMS . . . ." (Id. ¶ 9.) However, there is no evidence, aside from what may be inferred from her title, tending to show that Dr. Kionke had "final, unreviewable discretion to make a decision or take an action" as a CMS "policymaker" during her term as Dental Director for CMS. Andrews, 895 F.2d at 1481. The Court concludes "the record is devoid of, among other things, any evidence of a conscious decision or deliberate indifference of any high-level official alleged to have the appropriate policy-making authority." Muir, 2003 U.S. Dist. LEXIS 3035, at *6. This being so, Plaintiff has failed to show the existence of a CMS policy or custom demonstrating deliberate indifference, and summary judgment is also appropriate on this basis. See id. at *5-*6 (granting summary judgment in favor of City of Philadelphia on plaintiff's Eighth Amendment claims where plaintiff failed to show who was

16

policymaker).

**B.  Fourteenth Amendment Claims**

Construing Plaintiff's Amended Complaint and other documents in the record broadly, he has asserted both substantive due process and equal protection claims arising under the Fourteenth Amendment.  Plaintiff appears to claim that he had a fundamental right to see a specialist for his periodontal disease.  His Amended Complaint reads, in part, "CMS . . . has been deliberately indifferent to plaintiff's need for treatment . . . in violation of plaintiff's Eighth and Fourteenth Amendment rights."  (D.I. 10 at 3.)  Further, in his deposition, Plaintiff testified as follows:

    Q:  What is your exact claim?
    A.  Well, the thing is, I don't, I did not wish to be
        discriminated against in terms of my treatment.  I
        wanted the same treatment that other inmates have
        for serious diseases.  And it's a chronic disease,
        and I wanted the treatment.
    Q:  So your basic claim against CMS is solely that
        they didn't send you to a periodontist?
    A:  Yes.

(D.I. 77, Ex. A at 144.)  CMS also construes Plaintiff's Amended Complaint and deposition testimony as asserting substantive due process claims.  (See D.I. 76 at 21 ("This allegation, among other things, amounts to a claim by Plaintiff that he has the 'right' to see a specialist.  To prevail on this substantive [sic] due process claim . . . .").)  The Court agrees with this construction, and will determine whether Plaintiff's substantive

17

due process claim can withstand summary judgment.

Plaintiff's equal protection claim is more easily spotted; the Amended Complaint expressly states, in part, "Defendant CMS has denied to plaintiff equal protection . . . in violation of the Fourteenth Amendment." (D.I. 10 at 8.; see also D.I. 77, Ex. A at 144 ("I wanted the same treatment that other inmates have for serious diseases.").) Therefore, the Court will review the record for equal protection violations as well.

### 1. Substantive Due Process

Because Plaintiff's claims fall within the express guarantee of the Eighth Amendment, he may not rely on substantive due process as a separate basis for his claims. The Supreme Court has held that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." Albright v. Oliver, 510 U.S. 266, 273 (1994) (internal quotations and citations omitted); County of Sacramento v. Lewis, 523 U.S. 833, 843 (1998). The Eighth Amendment is an explicit textual source of constitutional protection requiring the Plaintiff's claim be analyzed under standards appropriate to the Eighth Amendment, not under due process standards. Therefore, a substantive due process analysis of Plaintiff's claims is inappropriate, and the Court will

18

decline to undertake such analysis. See Ward v. Taylor, Civ. No. 04-1391-KAJ, 2006 U.S. Dist. LEXIS 14135, at *24-*25 (D. Del. Mar. 30, 2006) ("Because Ward is a convicted inmate, the treatment he alleges must be challenged under the Eighth Amendment, and thus the Defendants' motion to dismiss the substantive due process claim wilt [sic] be granted.").

## 2. Equal Protection

The equal protection clause of the Fourteenth Amendment is a directive to States that they should treat all similarly situated persons alike. City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). In the prison context, an inmate must show that he was treated differently from similarly situated inmates due to intentional or purposeful discrimination. Wilson v. Schillinger, 761 F.2d 921, 929 (3d Cir. 1985); Boyer v. Taylor, Civ. No. 06-694-GMS, 2007 U.S. Dist. LEXIS 51159, at *29 (D. Del. July 16, 2007). Absent the presence of a fundamental right or a protected class (e.g., race), the disputed prison policy is subject to rational basis review, which requires only "that a regulation which results in unequal treatment of an inmate bear some rational relationship to a legitimate penological interest." Boyer v. Taylor, 2007 U.S. Dist. LEXIS 51159, at *30; Turner v. Safley, 482 U.S. 78, 89 (1987); Shaw v. Murphy, 532 U.S. 223, 229 (2001).

19

Plaintiff has not claimed that he was denied access to a specialist based on his membership in a protected class, and he concedes that "[a] prisoner has no independent constitutional right to medical care outside the institution." (D.I. 91 at 7); Pitts v. Hayman, Civ. No. 07-2256 (MLC), 2008 U.S. Dist. LEXIS 31650, at *24-*25 (D.N.J. Apr. 16, 2008) (citing Roberts v. Spalding, 783 F.2d 867, 870 (9th Cir. 1986)). Therefore, the Court will apply rational basis scrutiny. Under this standard, all that is required is that CMS's decision not to allow Plaintiff to see an outside periodontist, while allowing inmates suffering from other serious diseases to see specialists, bears a rational relationship to a legitimate penological interest.

The record reflects that Plaintiff did not see an outside dental specialist while at DCC, even though CMS "has provided inmates with outside consults when required." (D.I. 21 at 3.) Nevertheless, the Court concludes that based upon the record, there is a rational relationship to a legitimate penological interest for CMS's decision that it was unnecessary for Plaintiff to see an outside periodontist. CMS dentist Dr. Cathy Kionke explained to Plaintiff during his December 21, 2006 visit that "the majority of inmates here have gum disease and we can't send everybody out to a specialist." (D.I. 77, Ex. B-2.) She stated in her affidavit that

> [t]he process of taking an inmate out to see a
> specialist is not without security risks to the

> community and correctional staff involved in the
> transport. Consequently in order to minimize this
> inherent risk, CMS has equipped the dentists with the
> equipment needed to provide treatment for the inmate's
> periodontal issues . . . . This same equipment would
> be found in any general dentist and/or periodontist's
> office.

(Id., Ex. D, ¶ 10.)  DCC has a legitimate penological interest in

preventing harm to corrections officers and members of the

community at large.  Cf. Overton v. Bazzetta, 539 U.S. 126, 133

(2003) (reducing the number of outside visitors to a prison

promoted the legitimate penological interest of internal

security).  As Dr. Kionke stated, CMS sought to reduce inmate

travel, and any resultant danger, by providing its dentists the

necessary equipment to treat periodontal disease.  Given the

large number of inmates with periodontal disease, it is evident

that reducing the number of inmates who travel outside DCC for

specialist care is rationally related to this legitimate

penological interest.  Accordingly, the Court concludes that CMS

did not violate Plaintiff's right to equal protection.

## V.    CONCLUSION

For the foregoing reasons, Defendant CMS's Motion For

Summary Judgment (D.I. 75) will be granted.

An appropriate Order will be entered.